NATHAN FISHER, RESPONDENT, v. JOHN J. BREHM, APPELLANT, v. GEORGE WELLY, DEFENDANT.

Submitted June 5, 1924—Decided October 20, 1924.

B. gave his check to W. to pay to W. his losses in a card game. W. endorsed the check to F., who acquired it in good faith, for value, and without knowledge of the circumstances under which the check was given. The check was dishonored. F. instituted an action against B. and W. upon the check. The trial court refused to direct a verdict for the defendants and submitted the case to the jury instructing them that F. was entitled to recover if they found that F. was a holder in due course of the check under the Negotiable Instruments law: *Held*, (1) that the check was utterly void, under the third section of the Gaming act, even though it had been transferred to one who took it in good faith for value without notice of the circumstances under which it was given; (2) that the fifty-seventh section of the Negotiable In-

struments law did not repeal the third section of the Gaming act; (3) that the trial court erred in submitting the case to the jury; (4) that a verdict should have been directed in favor of the defendants.

On appeal from the Supreme Court.

For the appellant, John J. Brehm, *Reilly, Quinn & Parsons.*

For the respondent, *William I. Edwards.*

The opinion of the court was delivered by

KATZENBACH, J. This is an appeal from a judgment of the Supreme Court, based upon a verdict rendered by a jury at a trial held at the Monmouth Circuit. The action was instituted to recover the amount of a check held by the plaintiff. The check was dated January 22d, 1923, and was made by John J. Brehm to the order of George Welly for the sum of $2,000. It was drawn on the First National Bank of Sea Bright. Welly endorsed the check over to the plaintiff. Brehm and Welly were the defendants. Fisher, the plaintiff, came into possession of the check under the following circumstances: He was engaged in the garage business at Long Branch. He had sold to Welly a car for $1,050, and had taken the note of Welly for this amount. Fisher had also loaned to Welly $650, so that on January 22d, 1923, Welly was indebted to Fisher in the sum of $1,700, for which Fisher held Welly's note. On that day Welly came to the garage of Fisher, showed Fisher the check of Brehm, and stated he was prepared to pay his debt to Fisher with it. Fisher thereupon surrendered to Welly his note of $1,700, and gave Welly his check for $300 which Welly cashed. Fisher knew Brehm. He did not, before accepting from Welly the check, have any communication with Brehm. Fisher deposited Brehm's check at his bank, and it was returned protested. The testimony reveals that Brehm and Welly, with another, played a game of cards known as stud poker. Brehm

was the loser, and gave to Welly his check for $2,000 in part payment of his losses. The testimony is undisputed that the check was given for a gambling debt. Fisher had no knowledge, so far as the record discloses, of the circumstances under which the check was given by Brehm to Welly.

Upon the conclusion of the defendant's case the defendant moved that a verdict be directed for the defendant upon the ground that the check was void under the third section of the act entitled "An act to prevent gaming." 2 *Comp. Stat., p.* 2624. This motion was denied and an exception taken. The trial court, believing that the plaintiff was entitled to recover if the jury found he was a holder in due course, under the Negotiable Instrument law, of the check, submitted the case to the jury, which returned a verdict in favor of the plaintiff for the full amount of the check, with interest. From the judgment entered on this verdict, Brehm has appealed.

The sole question to be determined is whether a negotiable instrument, complete and regular upon its face, given in payment of a gambling debt, is enforceable against the maker in the hands of a holder who has taken it in good faith and for value without notice of any infirmity in the instrument.

The third section of the act to prevent gaming provides "that all promises, agreements, notes, bills, bonds, contracts, judgments, mortgages, leases, or other securities or conveyances, which shall be made, given, entered into, or executed by any person where the whole or any part of the consideration thereof shall be for money, property, or thing in action whatsoever laid, won or betted in violation of the first section of this act, or for reimbursing or repaying any money knowingly lent or advanced to help or facilitate such violations, shall be utterly void and of none-effect." By this act it was declared that the legislative policy of New Jersey was to hold utterly void and of none-effect all obligations given for gambling debts. The exact language of the section above quoted appeared first in the 1877 revision of the Statute law. There appears to be no decision of this state, holding that

such an obligation is as invalid and unenforceable in the hands of a *bona fide* holder for value without notice, as between the original parties to the instrument. Other states, however, having similar statutes have so held. The following are a few of these decisions: *Conklin* v. *Roberts,* 36 *Conn.* 461; *Jones* v. *Dannenberg,* 112 *Ga.* 426; *Pope* v. *Hanke,* 155 *Ill.* 617; *Sondheim* v. *Gilbert,* 117 *Ind.* 71; *First National Bank of Creston* v. *Carroll,* 80 *Iowa* 11; *Alexander & Co.* v. *Hazelrigg,* 123 *Ky.* 677; *Morris* v. *White,* 83 *Mo. App.* 194; *Lagonda Bank* v. *Portner,* 46 *Ohio* 381; *Unger* v. *Boas,* 13 *Pa.* 601; *Woodson* v. *Barrett,* 12 *Va.* 80. These decisions are based upon the ground that public policy is better served if all transactions pertaining to gambling are held absolutely void, although in certain cases of which the case *sub judice* is an example, a holder of a void instrument is harmed through no fault of his own. The adoption of this policy is no harsher in its effect that our statute which makes void the obligation of a married woman, given for the accommodation of another even though it comes into the possession of a *bona fide* holder for value without notice of the coverture of the maker. One who purchases for full value a stolen article, of which he is later deprived, is as much harmed as the party who in good faith acquires a negotiable instrument void in its inception. The respondent contends that the third section of the Gaming act is repealed by the fifty-seventh section of the Negotiable Instrument law. This section provides that "a holder in due course holds the instrument free from any defect of title of prior parties, and free from defenses available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon."

Section 197 of our Negotiable Instrument law provides that "of the laws enumerated in the schedule hereto annexed, that portion specified in the last column is repealed." No schedule is annexed. There is therefore no express repealer of the third section of the Gaming act. If it be repealed it must be by implication. As has been stated, the third section

of the Gaming act was enacted in its present form in 1877. Acts against gaming have been on our statute books since the year 1797. Gambling transactions in all forms have been under the ban of the law. Money lost in gaming can be recovered by the loser. All wagers are unlawful. All obligations for money lost are void. A transfer of property, real or personal, void under said third section, enures to the use of the heirs or legal representatives of the transferor. The law enacted upon the subject of gaming could not make it clearer that the policy of our state is condemnatory of all gambling. The Negotiable Instrument law was enacted to codify the common law on the subject of negotiable instruments, and was a part of a plan to adopt in all states a uniform act on negotiable instruments. It applies to nego tiable instruments. A check or note or other obligation given to pay a gambling debt is not a negotiable instrument. It is ineffectual to bind the parties or convey or support a right. It is void *ab initio*. It has no life; no vitality. This is well expressed in the case in the New York Court of Appeals of *Sabine* v. *Paine,* 223 *N. Y.* 401, in these words: "An instrument which a statute, expressly or through necessary implication, declares void, strictly speaking, is a *simulacrum* only. It is without legal efficacy. It cannot obligate a party or support a right. In *Claflin* v. *Boorum,* 122 *N. Y.* 385, 388; 25 *N. E. Rep.* 360, we said, 'a note void in its inception for usury continues void forever whatever its subsequent history may be. It is as void in the hands of an innocent holder for value as it was in the hands of those who made the usurious contract. No vitality can be given to it by sale or exchange, because that which the statute has declared void cannot be made valid by passing through the channels of trade.' "

Where one statute is relied upon to repeal another by implication the latter statute must be clearly repugnant to the former, or be manifestly intended to cover the same subject-matter by way of revision. *Hotel Registry Corporation* v. *Stafford,* 70 *N. J. L.* 528. Repeals by implication are never favored. *Ibid.* A court should endeavor by a reason-

able construction to uphold both acts. An application of these rules leads us to hold that the Gaming and Negotiable Instruments acts are not inconsistent, but reconcilable; that the third section of the Gaming act is not repealed by the Negotiable Instruments law, and that an obligation made void by the Gaming act between the parties cannot be made a valid obligation in the hands of an innocent holder for value.

While this question of an implied repealer has not heretofore been raised in this state it has been raised in other states which have enacted the Uniform Negotiable Instruments law, and also have acts on the subject of gaming substantially similar to the New Jersey act. The decisions have been with one exception, uniform in holding that negotiable instruments arising from gambling transactions cannot be enforced by a holder in due course, and that such instruments are not within the provisions of the Negotiable Instruments law. The cases which have so held are *Plank* v. *Swift,* 187 *Iowa* 293; *Levy* v. *Doerhofer,* 188 *Ky.* 413; *Larschen* v. *Lantzes,* 189 *N. Y. Supp.* 137; *Twentieth Street Bank* v. *Jacobs,* 74 *W. Va.* 525.

In the case of *Levy* v. *Doerhofer, supra,* decided by the Court of Appeals of Kentucky, in 1920, the court said: "It has been the policy of this state to suppress gaming, and the statutes making gaming contracts void are founded upon what the legislature has for many years deemed to be sound public policy. It is inconceivable that the general assembly, in the passage of the act of 1904, for the protection of innocent holders of negotiable instruments, intended to or did repeal (*Ky. Stat.* 1903, *p.* 1955), which declares all gaming contracts void. In our opinion the disappointment now and then of an innocent holder of a negotiable instrument would not be as hurtful and injurious to the best interests of the state as the removal of the ban from gaming contracts."

There are excerpts from other cases upon the comprehensive brief submitted by the appellant's counsel to the same effect, but we feel that further fortification of the position we take that the trial court erred in failing to direct a verdict

for the defendant is unnecessary. The judgment is accordingly reversed, with costs.

*For affirmance*—None.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, TRENCHARD, PARKER, MINTURN, KALISCH, BLACK, KATZENBACH, CAMPBELL, LLOYD, WHITE, GARDNER, VAN BUSKIRK, CLARK, McGLENNON, KAYS, JJ. 16.