RESORTS INTERNATIONAL HOTEL, INC., PLAINTIFF-APPELLANT, v. ARTHUR SALOMONE, DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Submitted December 9, 1980—Decided May 1, 1981.

Before Judges BOTTER, KING and McELROY.

*Sterns, Herbert & Weinroth,* attorneys for appellant (*W. S. Gerald Skey* on the brief).

*Donald R. Conway,* attorney for respondent (*Harry G. Carroll* on the brief).

The opinion of the court was delivered by

BOTTER, P. J. A. D.

The issue on this appeal is whether plaintiff (Resorts), a gambling casino operator licensed under the Casino Control Act (act), *N.J.S.A.* 5:12–1 *et seq.,* can recover $1,500 in credit extended to defendant on his issuance of three $500 checks, despite the fact that the checks were not deposited in the time required by *N.J.S.A.* 5:12–101(c) and one check was undated, contrary to *N.J.S.A.* 5:12–101(b)(2). *N.J.S.A.* 5:12–101(f) provides that any check "cashed, transferred, conveyed or given in violation of this act shall be invalid and unenforceable." Resorts contends that notwithstanding the invalidity of the *checks* drawn by defendant, plaintiff may sue on the underlying obligation incurred by defendant, of which the checks are mere evidence, as provided in *N.J.S.A.* 12A:3–802(1)(b) of the Uniform Commercial Code ("If the instrument is dishonored action may be maintained on either the instrument or the obligation . . .").

The essential facts in this case are not in dispute. On July 3, 1978 defendant signed and issued three separate instruments on

forms furnished by Resorts (referred to in the industry as counter checks or "markers") to the order of Resorts. Each was drawn on defendant's bank, New Jersey Bank of Westwood, in the sum of $500. It is not disputed that in exchange for these checks credit was given to defendant in the form of cash or chips to enable him to gamble in plaintiff's casino. Two checks were dated by "pit clerks" on the transaction date, July 3, 1978, but one check remained undated until July 30, 1978, when that date was inserted by plaintiff's "cage manager," Gary Thompson. All three checks were deposited with plaintiff's bank for collection for the first time on or about July 30, 1978. The checks were returned unpaid by defendant's bank because of insufficient funds in the account. Thereafter, plaintiff communicated with defendant in an effort to obtain payment but was unsuccessful, and this action was commenced.

Clearly, subsection (c) of *N.J.S.A.* 5:12-101 [1] was violated by plaintiff's failure to deposit each check for collection within

---

[1] *N.J.S.A.* 5:12-101 in its entirety provides:

a. Except as otherwise provided in this section, no casino licensee or any person licensed under this act, and no person acting on behalf of or under any arrangement with a casino licensee or other person licensed under this act, shall:

(1) Cash any check, make any loan, or otherwise provide or allow to any person any credit or advance of anything of value or which represents value to enable any person to take part in gaming activity as a player; or

(2) Release or discharge any debt, either in whole or in part, or make any loan which represents any losses incurred by any player in gaming activity without maintaining a written record thereof in accordance with the rules of the commission.

b. No casino licensee or any person licensed under this act, and no person acting on behalf of or under any arrangement with a casino licensee or other person licensed under this act, may accept a check, other than a recognized traveler's check or other cash equivalent, from any person to enable such person to take part in gaming activity as a player, or may give cash or cash equivalents in exchange for such check unless:

(1) The check is made payable to the casino licensee;

(2) The check is dated, but not postdated;

seven banking days of the date of the transaction. This subsection allows a casino operator to hold a check for less than $1,000 for seven banking days. A delay of 14 days is allowed for

(3) The check is presented to the cashier or his representative and is exchanged only for a credit slip or slips which total an amount equal to the amount for which the check is drawn, which slip or slips may be presented for chips at a gaming table; and

(4) The regulations concerning check cashing procedures are observed by the casino licensee and its employees and agents.

Nothing in this subsection shall be deemed to preclude the establishment of an account by any person with a casino licensee by a deposit of cash or recognized traveler's check or other cash equivalent, or to preclude the withdrawal, either in whole or in part, of any amount contained in such account.

c. When a casino licensee or other person licensed under this act, or any person acting on behalf of or under any arrangement with the casino licensee or other person licensed under this act, cashes a check in conformity with the requirements of subsection b. of this section, the casino licensee shall cause the deposit of such check in a bank for collection or payment within (1) seven banking days of the date of the transaction for a check in an amount less than $1,000.00; (2) fourteen banking days of the date of the transaction for a check of at least $1,000.00 but less than $2,500.00; or (3) ninety banking days of the date of the transaction for a check of $2,500.00 or more. Notwithstanding the foregoing, the drawer of the check may redeem the check by exchanging cash or chips in an amount equal to the amount for which the check is drawn; or he may redeem the check in part by exchanging cash or chips and another check which meets the requirements of subsection b. of this section for the difference between the original check and the cash or chips tendered; or he may issue one check which meets the requirements of subsection b. of this section in an amount sufficient to redeem two or more checks drawn to the order of the casino licensee. If there has been a partial redemption or a consolidation in conformity with the provisions of this subsection, the newly issued check shall be delivered to a bank for collection or payment within the period herein specified. No casino licensee or any person licensed under this act, and no person acting on behalf of or under any arrangement with a casino licensee or other person licensed under this act shall accept any check or series of checks in redemption or consolidation of another check or checks in accordance with this subsection for the purpose of avoiding or delaying the deposit of a check in a bank for collection or payment within the time period prescribed by this subsection.

d. No casino licensee or any other person licensed under this act, or any other person acting on behalf of or under any arrangement with a

checks from $1,000 to less than $2,500, and 90 days for checks in the sum of $2,500 or more. Subsection (b)(2) was also violated with respect to the undated check. That subsection requires every check to be "dated, but not postdated." It is possible, as the trial judge found from unclear answers to interrogatories furnished by plaintiff, that subsection (b)(3) was also violated. This section requires that checks be presented "to the cashier or his representative" to be exchanged only for a credit slip or slips which "may be presented for chips at a gaming table." However, we find it unnecessary to resolve this issue in view of the clear violation of the deposit requirements of *N.J.S.A.* 5:12–101(c) as to all checks and *N.J.S.A.* 5:12–101(b)(2) as to the undated check.

On cross-motions for summary judgment in the trial court, Judge Thomas Franklin, ruled in favor of defendant. He reasoned that the Casino Control Act intended "strict" regulation and control of licensed gambling activities "to further ... public confidence and trust," *N.J.S.A.* 5:12–1(b)(6) and (13); that *N.J.S.A.* 5:12–101(a)(1) prohibits a casino operator from cashing

---

casino licensee or other person licensed under this act, shall transfer, convey, or give, with or without consideration, a check cashed in conformity with the requirements of this section to any person other than:

(1) The drawer of the check upon redemption or consolidation in accordance with subsection c. of this section;

(2) A bank for collection or payment of the check; or

(3) A purchaser of the casino license as approved by the commission. The limitation on transferability of checks imposed herein shall apply to checks returned by the bank to the casino licensee without full and final payment.

e. No person other than one licensed as a casino key employee or as a casino employee may engage in efforts to collect upon checks that have been returned by banks without full and final payment, except that an attorney-at-law representing a casino licensee may bring action for such collection.

f. Notwithstanding the provisions of any law to the contrary, checks cashed in conformity with the requirements of this act shall be valid instruments, enforceable at law in the courts of this State. Any check cashed, transferred, conveyed or given in violation of this act shall be invalid and unenforceable.

any check or making any loan or giving any credit to enable a person to gamble unless certain conditions are met, and that, in addition to voiding the checks themselves, noncompliance with the conditions of *N.J.S.A.* 5:12–101 prevents an "underlying obligation" from coming into being and becoming enforceable.

We concur with Judge Franklin's reasoning and result. As he noted, the public policy of this State has traditionally opposed enforcement of gambling debts. *N.J.S.A.* 2A:40–3; *Schwartz v. Battifarano*, 2 *N.J.* 478, 483–484 (1949) (a judgment based on a gambling transaction declared void by statute is subject to collateral attack); *Fisher v. Brehm*, 100 *N.J.L.* 341, 345–346 (E. & A. 1924) (despite the Negotiable Instruments Law, a check or note given to pay a gambling debt "is not a negotiable instrument" and cannot be enforced by a holder in due course). Our Supreme Court has more recently enforced a gambling debt, evidenced by checks, lawfully contracted in Puerto Rico. *Caribe Hilton Hotel v. Toland*, 63 *N.J.* 301 (1973). However, in tracing the history of our public policy toward gambling, Justice Mountain concluded that "our policy has become one of carefully regulating certain permitted forms of gambling while prohibiting all others entirely." *Id.* at 307. Indeed, only by constitutional provision or amendment can any type of gambling be lawfully conducted in this state, subject to approved "restrictions and control." *N.J.Const.* (1947), *Art.* IV, § VII, par. 2. While gambling in licensed casinos has been legalized, the Legislature has imposed strict conditions for advancing credit and cashing checks to facilitate such gambling. It provided that no licensee "may accept a check, other than a recognized traveler's check or other cash equivalent, from any person to enable such person" to gamble unless specified conditions are met, *N.J.S.A.* 5:12–101(b), including condition (4), namely, that "[t]he regulations concerning check cashing procedures are observed by the casino licensee...." The question, therefore, is whether the language of the act and the purposes to be served sufficiently indicate that no obligation can arise from an extension of credit

upon the issuance of a player's check unless the act's conditions are satisfied.

As plaintiff contends, gambling in a licensed casino is now a lawful activity, and "gambling debts" properly reflected by checks are no longer unlawful. As noted above, plaintiff contends that *N.J.S.A.* 12A:3–802(1)(b) authorizes an action upon the underlying obligation when a check has been dishonored. Recognizing that *N.J.S.A.* 5:12–101(f) declares invalid and unenforceable a check transferred in violation of the act, plaintiff argues that a mere "blemish" in the handling of the check should not avoid the underlying obligation to repay consideration given in good faith. Indeed, the language used in *N.J.S.A.* 5:12–101(f) is not as broad as *N.J.S.A.* 2A:40–3, which voids all "promises, agreement, notes . . . securities or conveyances" given in payment of or as a loan for any illegal gambling transaction.[2] Plaintiff notes that its operations are monitored by the Division of Gaming Enforcement, which has authority to insure compliance with the requirements of the act, *N.J.S.A.* 5:12–76 to *N.J.S.A.* 5:12–79; and plaintiff contends that these enforcement procedures are sufficient to insure compliance with technical requirements for handling players' checks.

We do not find a solution to this problem in *N.J.S.A.* 12A:3–802. That section applies to negotiable instruments governed by Chapter 3 of the Uniform Commercial Code—"Commercial Paper." *N.J.S.A.* 12A:3–101 *et seq.; N.J.S.A.* 12A:3–102(1)(e). The essence of a negotiable instrument is that it be freely negotiable or transferable by delivery, with endorsement when necessary. See *N.J.S.A.* 12A:3–202; *N.J.S.A.* 12A:3–805. Although *N.J.S.A.* 12A:3–805 makes Chapter 3 applicable to certain negotiable instruments which are non-negotiable under the Code, namely, those "not payable to order or to bearer," see *N.J.S.A.* 12A:3–104(1)(d), mandating that "there can be no holder in due course of such an instrument," it permits the applica-

---

[2]Moreover, *N.J.S.A.* 5:12–124 expressly exempts casino licensees and players from the provisions of *N.J.S.A.* 2A:40–1, to which *N.J.S.A.* 2A:40–3 is keyed.

tion of Chapter 3 to such instruments so that they can be treated as negotiable so far as their form permits, provided their "terms do not preclude transfer." *N.J.S.A.* 12A:3–805, New Jersey Study Comment. However, the Legislature has limited the transferability of the checks which were issued in this case essentially to transfers for collection purposes only. *N.J. S.A.* 5:12–101(d) provides that such checks, even when cashed in conformity with the act, may not be transferred, conveyed or given, with or without consideration, to any person other than (1) the drawer, (2) a bank for collection or payment, or (3) an approved purchaser of the casino license. The section further provides: "The limitation on transferability of checks imposed herein shall apply to checks returned by any bank to the casino licensee without full and final payment." The checks may nevertheless be deposited for collection and are subject to Chapter 4 of the Uniform Commercial Code, *N.J.S.A.* 12A:4–101 *et seq.* ("Bank Deposits and Collections"); *N.J.S.A.* 12A:4–104(g) (" 'Item' means any instrument for the payment of money even though it is not negotiable...."). See also, Uniform Commercial Code Comment to § 3–805.

Therefore, we view checks given for the purpose of facilitating gambling in licensed casinos as *sui generis*. *Cf. Fisher v. Brehm, supra.* Whether *N.J.S.A.* 12A:3–802(1)(b) applies or not, the question remains whether there is an underlying obligation that is enforceable. *N.J.S.A.* 12A:3–802(1)(b) also provides that "discharge of the underlying obligor on the instrument also discharges him on the obligation." *N.J.S.A.* 12A:3–601 provides for discharge of a party from liability by various events or circumstances. Paragraph 1 of the Uniform Commercial Code Comment to § 3–601 states that discharge may be accomplished by a statutory provision applicable to an "instrument ... negotiated in a gaming transaction," meaning that the illegality of the transaction discharges the maker from liability. The maker of a nonnegotiable instrument may also assert defenses to liability that apply to ordinary contracts. See Uniform Commercial Code Comment to § 3–805.

In our view, the Legislature sufficiently signified its intention to void the gambling obligation represented by these checks when it provided that only "checks cashed in conformity with the. requirements of this act" shall be valid and enforceable. *N.J.S.A.* 5:12–101(f). It is fair to say that giving credit against checks to facilitate gambling in a licensed casino is unlawful if the check cashing and collecting regulations are violated. See *N.J.S.A.* 5:12–122, which makes it a disorderly persons offense to violate "any provision of this act the penalty for which is not specifically fixed...." We find no good reason to believe that the Legislature intended to allow enforcement of the underlying obligation for the loan while declaring the check void and unenforceable. While ordinary checks are frequently negotiated to third parties, including holders in due course, the act restricts the transfer of a player's checks so that rights of third parties, other than a successor licensee, will not arise. As between the player and the casino it makes no sense to say that the player cannot be sued on the check but can be sued on the underlying obligation. Voiding the check would be meaningless if the obligation it represents remains. Thus, we shun an interpretation of this statute that would make its express provisions meaningless. *See Foy v. Dayko,* 82 *N.J.Super.* 8, 13 (App.Div. 1964), certif. den. 41 *N.J.* 602 (1964).

The limitation on check collecting methods, *N.J.S.A.* 5:12–101(d) and (e), and the restrictions on the issuance of credit by taking a player's check serve related purposes. As noted in *New Jersey Governor's Staff Policy Group on Casino Gambling, 2nd Interim Report* (1977), ready, unlimited credit can have a "pernicious effect" upon the compulsive or imprudent player. At 34–35. Recommended was a check-cashing system which was adopted by the Legislature to allow the use of a "currently dated personal check, or a counter check" drawn on the player's bank within verifiable credit limits, to be deposited promptly (two business days were recommended) to "serve players who wish to gamble beyond their immediate cash resources." *Id.* at 35. The time limit on depositing checks is clearly intended to

contain the extent to which a player can pledge his future income. *Id.* The regulations are a compromise intended to serve the needs of the casinos as well as players. Nothing in the act prevents a player from establishing an account with a casino by the deposit of cash or traveler's checks which can be withdrawn freely. *N.J.S.A.* 5:12–101(b).

Plaintiff contends that enforcing these regulations by the self-policing method of voiding the underlying obligation will make collection of all checks and markers too uncertain for the casino industry. We disagree. A casino can readily establish compliance with the conditions of *N.J.S.A.* 5:12–101(b) and (c). Stamping the transaction date on the check would memorialize the current dating of the check. Similar practices could certify to the submission of the check to the cashier or his representative and the issuance of a credit slip to be exchanged for chips at a gaming table. Proving the date on which the check was deposited for collection presents no problem.

We merely hold that casinos must comply with the Legislature's strict control of credit for gambling purposes. Unless they do, the debts reflected by players' checks will not be enforced in our courts. If relaxation or clarification of this perceived mandate is desirable it can be provided by amendatory legislation.

The judgment below in favor of defendant is affirmed.